## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANJA BEACHUM, individually and on behalf of all others similarly situated, | : <br> : <br> : <br> : |
| Plaintiff, | : |
| | : **Civil Action No. <u>20-cv-1769</u>** |
| v. | : |
| | : **CLASS ACTION COMPLAINT** |
| SAKS INCORPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA INC., FENDI NORTH AMERICA, INC., LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCINELLI, USA, INC., | : **<u>JURY TRIAL DEMANDED</u>** <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

# Table of Contents

I.     INTRODUCTION .................................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................... 2

III.   PARTIES ................................................................................................................. 3

IV.    CLASS ACTION ALLEGATIONS ......................................................................... 5

V.     FACTUAL ALLEGATIONS .................................................................................... 7

       A.     Luxury Retail Goods and Apparel in the United States ........................................ 7

       B.     Luxury Retail Employees Are Skilled, Well-Trained Employees Who Enhance
              and Luxury Goods and Apparel Retailers' Brands ............................................... 9

       C.     In a Competitive Market, Defendants Would Hire Each Other's Luxury Retail
              Employees ........................................................................................................ 11

       D.     Higher Levels of Employee Mobility Lead to Higher Compensation ................. 14

       E.     Defendants Conspired to Fix Luxury Retail Employees' Compensation ............ 16

       F.     Defendants' No-Hire Agreements Inhibit Luxury Retail Employees' Mobility and
              Suppress Luxury Retail Employees' Compensation ............................................ 16

       G.     Defendants' No-Hire Agreements Inhibit Luxury Retail Employees' Mobility and
              Suppress Luxury Retail Employees' Compensation ............................................ 20

VI.    CAUSE OF ACTION ........................................................................................... 26

       COUNT 1 .............................................................................................................. 26

VII.   PRAYER FOR RELIEF ........................................................................................ 28

VIII.  JURY DEMAND ................................................................................................... 29

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Anja Beachum ("Plaintiff"), by her undersigned attorneys and on behalf of herself and all others similarly situated, hereby alleges the following against Defendants Saks Incorporated, Saks & Company LLC, Saks Fifth Avenue LLC (together, "Saks"), Louis Vuitton USA Inc. ("Louis Vuitton"), Fendi North America, Inc. ("Fendi"), Loro Piana & Co. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada"), and Brunello Cucinelli, USA, Inc. ("Brunello Cucinelli," together with Saks, Louis Vuitton, Fendi, Loro Piana, Gucci, and Prada, "Defendants"), seeking to recover for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. These allegations are made on personal knowledge as to Plaintiff and on information and belief as to others.

## I.     **<u>INTRODUCTION</u>**

1.     Defendants conspired and combined to fix and suppress compensation paid to their employees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     All Defendants employ skilled luxury retail labor, including employees who work in Defendants' stores, concessions, and/or boutiques; and sell and/or manage the sale of luxury goods to consumers ("Luxury Retail Employees").

3.     Defendants Louis Vuitton, Fendi, Loro Piana, Gucci, Prada, and Brunello Cucinelli (collectively, the "Concessionaires" or "Concessionaire Defendants") operate "stores-within-stores" or "concessions" at various Saks locations nationwide. At these concessions, the Concessionaire Defendants rent space in the Saks stores and operate relatively independently: they hire their own staff, make their own inventory determinations, and determine the depth and timing of markdowns and pricing.

4. Defendants' conspiracy consists of agreements between each of the Concessionaires and Saks not to hire each other's Luxury Retail Employees.

5. The actual and intended effect of these "No-Hire Agreements" is to reduce Luxury Retail Employees' labor mobility and thereby suppress Luxury Retail Employees' compensation to levels materially lower than they would have been in a competitive market.

6. Defendants—a premier nationwide department store and six of the most well-known and sought-after luxury goods and apparel brands—control a significant proportion of the labor market for Luxury Retail Employee services in the United States, and these No-Hire Agreements have reduced competition for Luxury Retail Employees' services, thereby suppressing Luxury Retail Employee compensation.

7. Defendants' conspiracy to fix and suppress compensation and their No-Hire Agreements unreasonably restrain trade in violation of Section 1 of the Sherman Act. Plaintiff, on her own behalf and on behalf of the Class, brings this antitrust action to enjoin Defendants from continuing their unlawful agreements, and to recover actual, compensatory and treble damages, as well as costs, attorneys' fees and interest.

## II. <u>JURISDICTION AND VENUE</u>

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

9. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and a significant proportion of members of the Class are citizens of states different than Defendants.

10. Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. § 1391. Each Defendant operates at least one

store in this District employing Luxury Retail Employees. Moreover, a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

11.     Defendants' alleged conduct was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including this District. During the Class Period (defined below), each Defendant, or one or more of its affiliates, used the instrumentalities of commerce, including interstate wires and the United States mail to effectuate their unlawful conduct.

12.     During the Class Period, Defendants directed their unlawful conduct at, and the conduct had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. The unlawful conduct in which the Defendants engaged had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## III.     PARTIES

13.     Plaintiff Anja Beachum resides in Michigan.  Plaintiff was employed by the Saks Defendants in Troy, Michigan as a Luxury Retail Employee between approximately February 2016 and September 2016, and between the summer of 2018 and December 2019. Plaintiff worked in the Saks "Contemporary" department, selling luxury goods and apparel.

14.     Defendant Saks Incorporated is a Tennessee corporation with its principal place of business at 225 Liberty Street, New York, New York.

15.     Defendant Saks & Company, LLC is a Delaware limited liability company with its principal place of business at 225 Liberty Street, New York, New York.

16.     Defendant Saks Fifth Avenue, LLC is a Massachusetts limited liability company with its principal place of business at 12 East 49th Street, New York, New York.

17.     The Saks Defendants are part of a retail conglomerate that employs approximately 40,000 employees worldwide, including thousands of Luxury Retail Employees at Saks stores throughout the United States that sell luxury goods and apparel to consumers.

18.     Defendant Louis Vuitton USA Inc. is a Delaware corporation with its principal place of business at 1 East 57th Street, New York, New York. Louis Vuitton operates over 100 stores, concessions, and boutiques in the United States.

19.     Defendant Fendi North America, Inc. is a Delaware corporation with its principal place of business at 555 Madison Avenue, New York, New York. Fendi operates 36 stores, concessions, and boutiques in the United States.

20.     Defendant Loro Piana & C. Inc., is a Delaware corporation with its principal place of business at 711 5th Avenue, New York, New York. Loro Piana operates 22 stores, concessions, and boutiques in the United States.

21.     The parent corporation of Louis Vuitton, Fendi, and Loro Piana, LVMH Moet Hennessey Louis Vuitton SE ("LVMH"), has more than 32,000 employees in the United States, including thousands of Luxury Retail Employees who sell luxury retail goods and apparel at Louis Vuitton, Fendi, and Loro Piana stores, concessions, and boutiques.

22.     Defendant Gucci America, Inc. is a New Jersey corporation with its principal place of business at 195 Broadway, New York, New York. Gucci and its corporate affiliates employ more than 14,000 employees worldwide, including hundreds of Luxury Retail Employees who sell luxury retail goods and apparel at Gucci's approximately 59 stores, concessions, and boutiques in the United States.

23.     Defendant Prada USA Corp. is a Delaware corporation with its principal place of business at 610 W. 52nd Street, New York, New York. Prada and its corporate affiliates employ more than 13,000 employees worldwide, including hundreds of Luxury Retail Employees who sell luxury retail goods and apparel at Prada's approximately 52 stores, concessions, and boutiques in the United States.

24.     Defendant Brunello Cucinelli, USA, Inc., is a New York corporation with its principal place of business at 350 Fifth Avenue, New York, New York. Brunello Cucinelli and its corporate affiliates employ more than 1,800 employees worldwide, including hundreds of Luxury Retail Employees who sell luxury retail goods and apparel at Brunello Cucinelli's approximately 21 stores in the United States.

## IV.    CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as representatives of a "Class" of Luxury Retail Employees defined as follows:

> All individuals in the United States and its territories that were employed by at least one of the Defendants at any time during the period of September 30, 2015 through and until the anticompetitive effects of Defendants' conduct ceases who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers.

26.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.  The following persons are excluded from the proposed class: Defendants' officers and directors; and any individuals employed by any Defendant whose employment function primarily concerns the purchase of luxury goods rather than their sale to consumers—*e.g.*, a store buyer.

27. The Class is so numerous and/or geographically dispersed that joinder of all members in this action is impracticable. On information and belief, Plaintiff alleges that the Class contains thousands of similarly situated employees. The members of the Class are readily identifiable from information and records that Defendants possess.

28. Plaintiff's claims are typical of those of the Class.

29. Plaintiff and all members of the Class were injured by the same unlawful conduct by Defendants, which denied the Class the benefits of competition among each Defendant for the class members' labor, and resulted in the Class members receiving less in compensation for their employment than they would have in a competitive market.

30. Plaintiff will fairly and adequately protect and represent the interests of the Class.

31. Plaintiff's interests are not antagonistic to the Class.

32. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class members. Such generally applicable questions are inherent in Defendants' unlawful conduct.

33. Questions of law and fact common to the Class include: (a) whether Defendants' conduct, including the agreement not to poach one another's Luxury Retail Employees, constitutes an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Act; (b) whether Defendants' agreements unlawfully restrained trade, commerce, and/or competition for labor among Defendants; (c) whether Defendants' conspiracies and associated agreements constitute *per se* violations of the Sherman Act; (d) whether Plaintiff and the Class suffered antitrust injury or the threat of injury, such as the suppression of compensation below competitive levels; and (e) the proper measure of damages.

34.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and employment litigation.

35.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## V.     FACTUAL ALLEGATIONS

### A.     Luxury Retail Goods and Apparel in the United States

36.     Defendants consist of a premier nationwide department store chain that sells luxury goods and apparel (the Saks Defendants) as well as six luxury brands that sell their goods and apparel through department stores (including the Saks Defendants), concessions (including concessions at the Saks Defendants), and their own standalone boutiques.

37.     For a long time, luxury goods relied on the rarity of materials and skilled craftsmanship and manufacturing, but beginning in the 1990s, the luxury retail sector began mass marketing, including by increasing the number of store locations, developing online businesses, and changing production methods to produce higher volumes of goods.

38.     To create and maintain the distinction between (and demand for) luxury goods over other, lower-priced goods, luxury goods manufacturers have gone to great lengths to market their luxury brands and create shopping experiences for customers.

39.     Luxury brands endeavor to cast themselves as shaped by cultural and historical heritage, and market their luxury brands as rooted in longer-term traditions rather than constantly-changing fashions. For example, Louis Vuitton markets that "[i]t was in 1837 that a 16-year-old Louis Vuitton arrived in  Paris by foot and started apprenticing for Monsieur Maréchal."[1]

40.     As one author put it, luxury brands are "auratic":

Similar to works of art, they 'possess an aura of authenticity which surrounded the original – nonmechanically reproducible – work, endowing it with qualities of uniqueness, distance and otherness.' Thus managing luxury consists in managing the aura of the brand over time… [T]he challenge [for luxury brands over time] is to create new products within the brand but without losing the brand's aura.[2]

41.      The Concessionaire Defendants have been tremendously successful in maintaining their luxury brands' auras, accounting for substantial market shares in the markets for luxury goods and apparel, and doing so at prices far higher than for comparable standard mass-market goods.

42.     One way that the Concessionaire Defendants accomplish this feat is by creating luxury shopping experiences at their boutiques and concessions through the décor and design as well as, importantly, through the customer service their sales staff supplies. Among the keys to this experience are their sales staff's ability to create and maintain the "aura of authenticity" the brands seek to establish and connect the customer's experience and purchase to the longer term traditions of the brand.  Doing so entails, *inter alia*, substantial skill and training of Luxury Retail Employees.

---

[1] LOUIS VUITTON, *A Legendary History*, https://us.louisvuitton.com/eng-us/magazine/articles/a-legendary-history#the-begining (last visited April 10, 2020).

[2] Delphine Dion & Eric Arnould, *Retail Luxury Strategy: Assembling Charisma through Art and Magic*, Journal of Retailing 502, 503 (Dec. 2011).

43. Saks also endeavors to maintain a similar luxury shopping experience for its department store customers, selling the Concessionaire Defendants' goods in Saks stores at which the Concessionaire Defendants do not have concessions, and by selling other, competing luxury brands. Saks accomplishes its luxury shopping experience goals, like the Concessionaire Defendants, through décor and design as well as through the customer service their sales staff supplies. As Saks President Marc Metrick said at a recent Wharton "CEO Summit," "When you're spending the kind of money that we're asking people to spend, there needs to be an experience, there needs to be theater; you don't stream Hamilton on Netflix … You go to the theater and watch it."[3]

44. Thus, Saks and the Concessionaire Defendants are competitors in the labor market for Luxury Retail Employees' services.

**B.** **Luxury Retail Employees Are Skilled, Well-Trained Employees Who Enhance and Luxury Goods and Apparel Retailers' Brands**

45. The customer-facing task of selling luxury goods and apparel in physical stores is performed by thousands of Luxury Retail Employees in the United States.

46. Selling luxury goods and apparel requires extensive training on service, selling, and product-knowledge. Defendants invest in training their Luxury Retail Employees because well-trained salespeople are a crucial component of success for luxury retailers and what sets them apart from other retailers.

47. Luxury goods and apparel retailers seek to create a shopping experience for customers—an atmosphere of exclusivity and opulence surrounding their luxury products.

---

[3] CEO Summit – Powering the Future of Retail in a Changing Environment, The Wharton School Baker Retailing Center (Oct. 15, 2019), https://bakerretail.wharton.upenn.edu/wp-content/uploads/2019/11/2019-CEO-Summit.pdf.

48.     Defendants and customers expect Luxury Retail Employees to be knowledgeable about the particular products each Defendant manufactures and/or sells, as well as current trends, because a knowledgeable salesperson can make all the difference for consumers considering purchasing expensive luxury items.

49.     Defendants encourage their Luxury Retail Employees to maintain frequent personal contact with customers, especially customers who regularly purchase luxury retail goods. Sales associates provide business cards to, and endeavor to establish a rapport with such customers to encourage them to return to Defendants' stores for their luxury goods purchases.

50.     Prada, for example, operates its "Prada Academy," at which it offers retail training to employees, including "brand knowledge" and "selling and customer experience" trainings. According to Prada, "A particular focus [at Prada Academy] is put on the adoption of new ways of communication and relations with [customers]...."[4]

51.     Fendi, as another example, has a "Retail Training Department" which "develops projects geared towards boutique personnel, with the purpose of developing their knowledge of the collections, so that they can communicate Fendi's values, history and savoir faire, and be able to offer clients a unique purchasing experience."[5]

52.     For its part, Saks has robust employee training and emphasizes customer relationships with its employees. Then-Saks Senior Vice President of Organizational Effectiveness Jim Viola said, "Service is one of the most important expectations as a luxury retailer. We are setting these expectations as soon as someone comes to work for us, and [we]

---

[4] *See* Academy, https://www.pradagroup.com/en/talents/prada-academy.html (last visited Apr. 10, 2020)

[5] *See* Fendi Careers, https://careers.fendi.com/professional-area/retail-training/ (last visited Apr. 11, 2020).

make it easy for them to learn." Saks President Marc Metrick has emphasized that Saks outpaced its luxury retail competitors over the past few years by "deliver[ing] exceptional service by creating a very deep connection" with Saks customers. Metrick also called Saks's stylists and in-house sales associates the key differentiator for the business against pure play e-commerce companies (which, by their nature, cannot offer the luxury shopping experience that Defendants seek to create for luxury goods purchasers).[6]

### C. <u>In a Competitive Market, Defendants Would Hire Each Other's Luxury Retail Employees</u>

53.     Each Defendant faces competition from rival luxury retailers in the labor market for Luxury Retail Employees, including department stores, concessions, and standalone boutiques.

54.     In a properly functioning and lawfully competitive labor market, each Defendant would compete with the other Defendants for employees by soliciting each other's current employees and/or accepting applicants currently employed by another Defendant. A properly functioning market would involve prospective employers freely communicating with prospective employees—even if the employee does not first express interest—and employees communicating intra-store and at other stores owned by their employer or another Defendant about wages and employment opportunities.

55.     Defendants would realize significant advantages in such lateral hiring. For example, by hiring a Luxury Retail Employee from a rival luxury retailer, a Defendant would save on training costs and receive the immediate benefits associated with the other Defendant's

---

[6] CEO Summit – Powering the Future of Retail in a Changing Environment, The Wharton School Baker Retailing Center (Oct. 15, 2019), https://bakerretail.wharton.upenn.edu/wp-content/uploads/2019/11/2019-CEO-Summit.pdf.

well-trained, motivated salesperson who already has cultivated relationships with luxury goods customers, and who has demonstrated the capability of providing luxury goods customers with a luxury shopping experience. Such Luxury Retail Employees would enhance the hiring Defendant's brand and increase sales and profitability.

56.     On the other hand, hiring inexperienced salespeople or those who lack experience in selling luxury goods and crafting the luxury shopping experience provided by Luxury Retail Employees works as a disadvantage to Defendants' businesses and bottom lines.

57.     The hiring company must invest resources in identifying and assessing whether the inexperienced sales applicant is capable of providing the luxury buying experience the company's customers expect and require. The hiring company must also invest greater resources in training the inexperienced sales applicant and does not gain the benefit of the experienced Luxury Retail Employees' existing customer relationships, enhanced brand image, existing product knowledge, and corresponding increased sales.

58.     Because of the advantages luxury retailers would realize in hiring experienced Luxury Retail Employees, in a properly functioning and lawfully competitive labor market, if a Saks Luxury Retail Employee perceived Louis Vuitton, for example, to provide better compensation or benefit terms for that employee, the Luxury Retail Employee would be free to communicate with Louis Vuitton about potential employment opportunities, apply to Louis Vuitton, and ultimately obtain employment at Louis Vuitton.

59.     Many of Defendants' stores are located in close proximity to each other. For example, the Troy, Michigan Saks store at which Plaintiff worked was located in a mall that also housed Louis Vuitton and Gucci standalone boutiques. Further, that same Troy, Michigan Saks store housed Louis Vuitton and Gucci concessions. As a result, Plaintiff commonly came into

contact with Louis Vuitton and Gucci employees, and as set forth *infra*, she both knew of a No-Hire Agreement between Saks and Louis Vuitton and unsuccessfully endeavored to gain employment at Louis Vuitton.

60.     The effects of labor competition in a properly functioning labor market is not limited to when employees seek out better compensation, benefits, or other terms or conditions of employment based on information they are able to ascertain. Indeed, the practice known as "cold calling," where an employer actively recruits competitors' employees, is an important aspect of a properly functioning, competitive labor market.

61.      Companies generally, and luxury retailers in particular, perceive rival luxury retailers' current employees, especially those not actively seeking other employment, as better potential employees than other candidates. This is true, at least in part, because companies value satisfied employees who are good at their jobs, leading them to perceive competitors' current employees as more qualified, harder working, and more stable than candidates who are unemployed or actively seeking employment outside of their current jobs.

62.     As a result, companies seeking to hire new employees will lessen the risks associated with hiring by seeking to hire a competitor's employee.

63.     Moreover, through lateral hiring of competitors' employees, companies can take advantage of competitors' efforts expended in soliciting, interviewing, and training their skilled labor, while simultaneously inflicting a cost on the competitor by removing a trained, skilled employee that must then be replaced—at some cost to the competitor.

64.     So, for example, if Gucci hired a Luxury Retail Employee that Saks had recruited, interviewed, and trained, Gucci would benefit from the new hire's labor while simultaneously harming Saks by taking away a valued Saks employee.

65.     Thus, lateral hiring, including through cold-calling and other recruiting efforts, is a key form of competition among luxury retail employers.

**D.     <u>Higher Levels of Employee Mobility Lead to Higher Compensation</u>**

66.     No-hire agreements, in general, significantly affect employee compensation and benefits as well as other terms and conditions of employment, and Defendants' No-Hire Agreements are no exception.

67.     For example, if an employee of luxury retailer A receives an offer of employment at luxury retailer B for higher compensation, the employee can either accept that offer or attempt to negotiate a pay increase with luxury retailer A. Either way, the employee's compensation increases.

68.     The compensation affect is not limited to the employee who receives the offer, however. If the employee leaves for luxury retailer B to obtain higher compensation, luxury retailer A loses the employee and will need to hire a replacement employee, which entails its own training and replacement costs. To stop losing employees and paying those increased training and replacement costs, a rational luxury retailer A would increase compensation of all employees. If luxury retailer A instead opts to increase the employee's pay to dissuade the employee from accepting luxury retailer B's employment offer, then luxury retailer A will need to raise the pay of other Luxury Retail Employees to maintain internal equity.

69.     Specifically, the raise provided to the employee would become known by other employees at luxury retailer A, who would then demand similar raises and/or similarly pursue the employment opportunity at luxury retailer B that the original employee forewent in favor of the pay raise from luxury retailer A. Thus, the ability of employee to switch between luxury retailers A and B creates labor competition for the services of Luxury Retail Employees that has the effect of raising compensation for all Luxury Retail Employees.

70.     Furthermore, when employers become aware of attractive outside opportunities for their Luxury Retail Employees, the threat of losing employees—even absent offers to the employer's own Luxury Retail Employees by outside employers—can encourage employers to preemptively raise compensation to increase morale and competitive positioning and mitigate the threat of losing their employees to competitors

71.     Defendants carefully monitor and manage internal equity in their internal compensation formulas to achieve certain goals, including, *inter alia*: (a) maintaining parity in Luxury Retail Employees' compensation within the same employment categories (*e.g.*, among sales associates like Plaintiff) and across different employment categories (*e.g.*, among managers relative to sales associates); (b) maintaining employee morale and productivity (which can be sacrificed if, for example, Luxury Retail Employees see their peers at the same company receive higher compensation, better benefits, or other more favorable terms and conditions of employment for performing the same labor); (c) retaining Luxury Retail Employees; and (d) attracting new Luxury Retail Employees.

72.     Each Defendant sets baseline compensation levels and structures for different employee categories that apply to every Luxury Retail Employee within each category. Each Defendant also compares the baseline compensation levels and structures across different employee categories. Although employees' compensation may differ between employees in the same categories, the compensation is, at a minimum, based on the baseline compensation levels and structures applicable to employees' categories.

73.     Thus, in a properly functioning and competitive labor market, each Defendant would use lateral hiring, including cold calling, as a tool for recruiting skilled labor. Such

recruiting activities in the Luxury Retail Employee labor market would increase Luxury Retail Employee compensation across the board throughout the market.

**E.**      **Defendants Conspired to Fix Luxury Retail Employees' Compensation**

74.      The No-Hire Agreements between Saks and each of the Concessionaire Defendants that the Concessionaire Defendants will not hire Saks's Luxury Retail Employees or Luxury Retail Employees who were employed by Saks within the previous six months comprise Defendants' illegal conspiracy in restraint of trade.

75.      The full scope of the No-Hire Agreements between Saks and the Concessionaire Defendants (and other luxury retailers, such as those that operate concessions at Saks stores) shall be determined through discovery.

76.      Upon information and belief, the No-Hire Agreements have been in place since at least 2014 and have been recognized, ratified, and enforced since that time.

77.      Each Defendant entered into the No-Hire Agreements and the overarching conspiracy with knowledge of the other Defendants' participation, and with the intent of accomplishing the conspiracy's objective: to reduce Luxury Retail Employee mobility, reduce competition for skilled labor of Luxury Retail Employees, and to suppress Luxury Retail Employee compensation.

**F.**      **Defendants' No-Hire Agreements Inhibit Luxury Retail Employees' Mobility and Suppress Luxury Retail Employees' Compensation**

78.      Defendants' No-Hire Agreements unduly restrict lateral hiring of Luxury Retail Employees when employees actually attempt to switch employers, by dissuading Luxury Retail

Employees from even applying to switch in the first place, and by preventing practices like cold calling that prevail in properly functioning competitive markets.[7]

79.    For example, without the benefit of cold calling or even the ability to obtain employment with another Defendant like Louis Vuitton, a Saks Luxury Retail Employee lacks leverage when negotiating compensation, benefits, and/or terms and conditions of employment.

80.    Defendants' No-Hire Agreements thus remove competition in the labor market for Luxury Retail Employees' services.

81.    Luxury Retail Employees do, in fact, seek to switch between luxury retailers in search of higher compensation and benefits. Indeed, Plaintiff and others have tried to switch (unsuccessfully) from working for one Defendant to working for another to obtain higher pay.

82.    As a result of Defendants' No-Hire Agreements, Luxury Retail Employees rarely switch between Defendants.

83.    If Luxury Retail Employees were permitted to freely move between Defendants' employ, as they would in a properly functioning, competitive labor market, compensation information would flow more freely between employees—particularly given the close physical distances and relationships between Defendants' stores, boutiques, and concessions. Such information flows would increase Luxury Retail Employees' mobility between Defendants, which would, in turn, increase compensation.

---

[7] At least some of Defendants' No-Hire Agreements have specific, narrow exceptions. Specifically, under some of the No-Hire Agreements, the Concessionaire Defendant may hire a current or former Saks Luxury Retail Employee only if: (i) a manger from Saks and a manager from the hiring Concessionaire Defendant agree to allow the Luxury Retail Employee to switch employers; or (ii) if more than six months have passed since the Luxury Retail Employee last worked at Saks.

84.     Moreover, unconstrained by the No-Hire Agreements, Defendants would actively recruit or "cold-call" each other's Luxury Retail Employees. Indeed, given the close physical proximity of stores, boutiques, and concessions, Defendants have significant information on each other's employees. For example, Saks employees can observe the Concessionaire Defendants' concession employees work and productivity firsthand, and vice versa, giving Defendants' employees with hiring discretion and authority important information that could be used to cold call employees that would present the best value propositions to the poaching retailer. Even outside the case of concessions, the close physical proximity of the Concessionaire Defendants' boutiques and Saks stores provides ample opportunity for Defendants' employees charged with hiring decisions to observe other Defendants' Luxury Retail Employees and their productivity and skills. The No-Hire Agreements necessarily eliminate such poaching activities.

85.     Agreements to allocate service markets, as Defendants' No-Hire Agreements do here, are functionally the same as agreements to allocate territories for the sale of products. Both are simply means to fix prices. As Joseph Harrington, Chair of the Business Economics and Public Policy Department in the Wharton School of Business at the University of Pennsylvania said, "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers."[8]

86.     According to Professor Peter Cappelli, Wharton Professor of Management and Director of the Wharton Center for Human Resources, agreements not to compete for competitors' employees are unfair to those employees, and such a pact "benefits the companies

---

[8] *Silicon Valley's No-poaching Case: The Growing Debate over Employee Mobility*, Wharton Sch. Of the Univ. of Penn. (Apr. 30, 2014), *available at* http://knowledge.wharton.upenn.edu/article/silicon-valleys-poaching-case-growing-debate-employee-mobility/ (last visited April 10, 2020).

at the expense of their employees."[9] Professor Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough not to leave."[10]

87.     Agreements to allocate labor markets can be more harmful than agreements to allocate product markets, which are also *per se* illegal under the antitrust laws. Every employer exercises market power over its employees in a manner that surpasses the market power of nearly every seller of products over its customers, and employment relationships are much stronger than customer relationships.  For example, it is difficult and costly to switch employers: employees must decide to apply for another job, submit an application, be interviewed, and if offered the job, change a fundamental and regular part of their life. By contrast, a product customer may freely switch from one brand to another.

88.     As a result, employment relationships are much "stickier" and are far harder to change than customer relationships. The strength of the employer/employee relationship provides employers with the power to suppress pay, particularly when they act in concert with their direct labor competitors to eliminate competition among them.

89.     In the absence of a No-Hire Agreement, luxury retailers would face increased pressure to offer periodic pay increases, superior benefits, better working hours, and/or better work-schedule flexibility to retain employees. Such pressure would result in higher compensation to Luxury Retail Employees.

---

[9] *Id.*

[10] *Id.*

### G. Defendants' No-Hire Agreements Inhibit Luxury Retail Employees' Mobility and Suppress Luxury Retail Employees' Compensation

90.	Defendants each entered into, implemented, and policed the No-Hire Agreements with the purpose and effect of restraining competition in the market for Luxury Retail Employees and fixing the compensation of their Luxury Retail Employees at artificially low levels.

91.	As Plaintiff's and other Saks employees' experiences set forth below illustrate, the No-Hire Agreements had the effect of preventing Luxury Employee mobility and suppressed compensation for individual Luxury Retail Employees that were prevented from seeking and obtaining better-paying positions with other Defendants, even when managers at those other Defendants expressed a desire to hire the Saks employees. This effect spread through the market for Luxury Retail Employees.

92.	Moreover, the No-Hire Agreements suppressed compensation for all members of the Class as a group because they eliminated competitive pressure for each Defendant to preemptively raise Plaintiff's and members of the Class's compensation by eliminating the potential for attractive employment opportunities at other Defendants' and their unnamed co-conspirators' stores, concessions, and boutiques. Because the agreements eliminated competition in the labor market for Luxury Retail Employees, each Defendant benefited from the absence of competitive pressure that would have increased compensation to Plaintiff and other members of the Class under competitive conditions.

93.	Each Defendant could therefore retain Plaintiff and other members of the Class at artificially suppressed compensation levels because, even if more highly compensated positions became available with other Defendants or unnamed co-conspirators, Plaintiff and other members of the Class would be unable to seek those positions.

94.     Moreover, because Defendants and their unnamed co-conspirators are competitors for Luxury Retail Employees, the No-Hire Agreements drastically increased the costs for Plaintiff and the Class to seek or accept employment elsewhere. Through their unlawful agreements not to hire one another's employees, Defendants and their unnamed co-conspirators were able to prevent Plaintiff and other members of the Class from seeking and obtaining other employment opportunities in the market for Luxury Retail Employee services. As a direct result of these unlawful agreements, Plaintiff and members of the Class who wished to change positions had no choice but to accept employment for lower compensation at less prestigious companies where the same opportunities to sell luxury retail goods do not exist or leave the labor market for Luxury Retail Employees altogether, thus losing their the opportunity to use their skills.  As a result, Defendants were able to retain Plaintiff and the Class at artificially low compensation levels by inhibiting Plaintiff's and the Class's ability to switch employers.

95.     The No-Hire Agreements thus artificially suppressed compensation for Plaintiff and the Class.

96.     The absence of labor competition in the market for Luxury Retail Employees is not merely theoretical. Plaintiff and many other members of the Class sought employment from a Defendant other than the Defendant for whom they worked and were unable to gain and/or decided not to apply for such employment because of the No-Hire Agreements.

97.     In late 2018 or 2019, Plaintiff sought to switch employers because she was unhappy with her compensation at Saks. However, the existence of a No-Hire Agreement between Saks and Louis Vuitton that prevented Louis Vuitton from considering applications to its Saks concession at the Troy, Michigan Saks was common knowledge among Saks employees.

98.     Plaintiff had experience selling luxury goods, including those manufactured by Chanel and Prada, and as part of her position in the Contemporary Department at Saks, often assisted luxury goods customers in their shopping experience. In particular, she was experienced at helping such luxury goods customers find the luxury goods that met their needs, including by taking customers to the Louis Vuitton and/or Gucci concessions when appropriate. By virtue of this position, she developed considerable luxury goods product knowledge that is valuable to luxury goods retailers such as the Concessionaire Defendants.

99.     Because of Plaintiff's knowledge of a No-Hire Agreement that would prevent her from obtaining employment, at the very least, at the Louis Vuitton concession in the Saks Troy, Michigan store, Plaintiff did not even bother to apply to Louis Vuitton's concession during her job search. She did, however, leave her resume with the Louis Vuitton boutique in the same Troy, Michigan mall in which her Saks store was located. She never heard back from Louis Vuitton concerning that application for employment.

100.     Because she was unable to obtain better compensation as a Luxury Retail Employee, Plaintiff left the Luxury Retail Employee labor market. Due to the No-Hire Agreement(s), Plaintiff was unable to seek and obtain employment at Saks's competitor, Louis Vuitton, where she may have benefited from greater compensation.

101.     Saks employees in other locations were also detrimentally impacted by Defendants' No-Hire Agreements.

102.     For example, like Plaintiff, a Saks employee in Beachwood, Ohio[11] sought employment at Louis Vuitton to obtain better compensation. That employee spoke with a Saks

---

[11] As in the Troy, Michigan Saks, Gucci and Louis Vuitton also operated concessions in the Beachwood, Ohio Saks.

Human Resources Director, who informed the employee of a policy between Saks and its concessions operators  pursuant to which a Saks Luxury Retail Employee seeking employment with a company that operates concessions at Saks must resign from Saks and wait six months prior to the concession company being allowed to hire the employee.

103.    Nevertheless, the Beachwood Saks Luxury Retail Employee contacted a store manager at Louis Vuitton concerning potential employment. The Louis Vuitton store manager responded, confirming the existence of Louis Vuitton's No-Hire Agreement with Saks that required a six-month waiting period. Months later, the Beachwood Luxury Retail Employee again reached out to the Louis Vuitton store manager and was again told that the No-Hire Agreement prevented Louis Vuitton from hiring the employee.

104.    Then, after the Beachwood Saks Luxury Retail Employee observed a former Saks employee had been hired by Louis Vuitton prior to the six-month waiting period, the Beachwood Saks Luxury Retail Employee filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Louis Vuitton. Louis Vuitton defended against the charge by explaining that it had a No-Hire Agreement with Saks and that the agreement, and not discrimination was the basis for Louis Vuitton not hiring the Beachwood Saks Luxury Retail Employee. Louis Vuitton further explained how the other former Saks employee evaded the No-Hire Agreement, stating that the other former Saks employee obtained consent from a Saks manager.

105.    Another Beachwood, Ohio Saks Luxury Retail Employee had multiple conversations with a Gucci store manager, including one 2015 conversation in which the Gucci store manager told her that she would be a perfect fit to work at Gucci. However, the Gucci store manager told the second Beachwood Saks Luxury Retail Employee that the store manager could

not "technically recruit" the Beachwood Saks Luxury Retail Employee. The Gucci store manager suggested that the Luxury Retail Employee explore opportunities at Gucci on the Gucci website but warned that the Luxury Retail Employee would have to wait out a "six-month cooling off period" after leaving Saks in order to be hired by Gucci.

106.    That second Beachwood Saks Luxury Retail Employee also spoke with a general manager at Prada in February 2016. The Prada general manager also told the Saks employee that Prada had an agreement with Saks not to recruit Saks Luxury Retail Employees, and that, despite Prada's interest in the Beachwood Saks Luxury Retail Employee, neither the general manager nor anyone else at Prada with hiring authority could "initiate contact" with the employee.

107.    Yet another Saks Luxury Retail Employee, a Brand Ambassador, at a New York Saks store grew frustrated with her compensation and, in 2017, began to search for employment elsewhere as a Luxury Retail Employee. She contacted two prominent recruitment agencies with experience placing candidates within the luxury retail industry. Representatives from both agencies told the New York Saks Luxury Retail Employee that it would be difficult to place the employee with luxury brands carried by Saks. One representative informed the employee of positions with Loro Piana, Louis Vuitton, and Brunello Cucinelli for which the employee was well-suited, but told the employee that she could not place the employee in those positions unless the employee quit Saks and waited to seek work in the industry. Without an alternative source of income for the waiting period, the employee could not resign from Saks and refused to do so. The New York Saks Luxury Retail Employee instead continued to seek employment as a Luxury Retail Employee for months, finally obtaining such employment at a smaller luxury retailer whose brand Saks does not carry.

108.    Collectively, Plaintiff and these other Saks Luxury Retail Employees were prevented from switching from working for Saks to working for other Concessionaire Defendants by Defendants' No-Hire Agreements.

109.    Each Defendant actively concealed its No-Hire Agreement(s) (and their particular terms and exceptions) from Luxury Retail Employees, including Plaintiff.

110.    For example, although Louis Vuitton's No-Hire Agreement with Saks was common knowledge at the Troy, Michigan store among Saks employees, Saks and Louis Vuitton hid the scope of that agreement (*e.g.*, whether it applied to just the Louis Vuitton concession or Louis Vuitton more broadly) and any exceptions that Saks employees could make use of (*e.g.*, whether they could obtain permission from a Saks manager to seek employment at the Louis Vuitton concession) from Plaintiff and other Saks Luxury Retail Employees.

111.    Defendants' conspiracies were ideal tools to suppress their Luxury Retail Employees' compensation. Whereas agreements to fix specific individuals' compensation packages would be hopelessly complex and impossible to monitor, implement, and police, the No-Hire Agreements that eliminated entire categories of competition for skilled labor that affected the compensation and mobility of all Luxury Retail Employees in a common and predictable fashion) were simple to implement and easy to enforce.

112.    Plaintiff and all other members of the Class were harmed by the No-Hire Agreements alleged herein. Defendant's unlawful No-Hire Agreements restrained competition in the labor market for Luxury Retail Employee services, which had the effect of suppressing compensation and mobility for all members of the Class.

113. Without this class action, Plaintiff and the Class will remain unable to obtain relief for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracies.

114. Defendants' and their unnamed co-conspirators' unlawful No-Hire Agreements are *per se* illegal horizontal restraints on trade.

115. In the alternative, Defendants are liable under a "quick look" analysis where someone with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

116. In the alternative, Defendants are liable under a rule of reason analysis because their unlawful agreements not to hire one another's Luxury Retail Employees reduced compensation and restrained competition in the labor market for Luxury Retail Employees. The unlawful No-Hire Agreements entered into by Defendants and their agents and co-conspirators had no procompetitive effects and were not intended to have procompetitive effects. Indeed, the No-Hire Agreements had substantial anticompetitive effects, including, but not limited to, eliminating competition, preventing Plaintiff and members of the Class from obtaining employment and earning compensation in a competitive market, reducing compensation, and preventing or limiting employment opportunities and choice with respect to such opportunities. The anticompetitive effects outweighed any procompetitive benefits of the conspiracy.

## VI.   <u>CAUSE OF ACTION</u>

**COUNT 1**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act**
**(On Behalf of the Class)**

117. Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

118.    Defendants entered into and carried out illegal contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119.    For a period of time starting no later than 2014, each of the Concessionaire Defendants entered into unlawful contracts, combinations, and/or conspiracies in restraint of trade with Saks under which each Concessionaire Defendant agreed not to hire Saks's Luxury Retail Employees or who had been employed by Saks within the previous six months, and accordingly declined to hire or attempt to hire Plaintiff and the other members of the Class. Defendants would only make exceptions to these No-Hire Agreements upon the agreement of both Saks and the Concessionaire Defendant who sought to hire a given Luxury Retail Employee.

120.    Defendants' unlawful conduct included concerted efforts, actions, and undertakings with the intent, purpose, and effect of: (a) unnaturally restraining the total compensation paid to Plaintiff and the Class members; (b) eliminating competition among Defendants for skilled labor; and (c) restricting the ability of Luxury Retail Employees to obtain higher pay and benefits, superior working conditions, and other employment opportunities and advancement.

121.    Defendants engaged in this unlawful conduct with the specific intent to reduce their costs for their own benefit at the expense of Plaintiff and other Class members.

122.    Defendants' actions in furtherance of this unlawful conduct were authorized, ordered, or done by Defendants' respective officers, agents, directors, employees, or representatives while actively engaging in the management of Defendants' respective affairs.

123.     As a result of Defendants' unlawful conduct, Plaintiff and the Class received reduced compensation at levels below those that otherwise would have prevailed.  Plaintiff and the Class accordingly have been injured and have suffered damages in an amount according to proof at trial.

124.     There are no procompetitive justifications for Defendants' conduct, or if there are, they are outweighed by the anticompetitive effects and, in any event, could be achieved through less restrictive means.

125.     Contracts, combinations, and/or conspiracies between each of the Concessionaire Defendants and Saks have had a substantial effect on interstate commerce.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a) Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

b) Issue an order certifying the Class as defined above;

c) Appoint Plaintiff as a representative of the Class;

d) Appoint Plaintiff's counsel as class counsel;

e) Declare that Defendants' conduct set forth herein is unlawful under Section 1 of the Sherman Act;

f) Issue a judgment and order requiring Defendants to pay damages to Plaintiff and the members of the Class for violations of 15 U.S.C. § 1, trebled;

g) Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

h) Grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

i) Permanently enjoin Defendants from engaging in further unlawful conduct and agreements that unreasonable restrict competition as described herein;

j)      Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program designed to give immediate notification to the members of the Class;

k)      Award pre- and post-judgment interest on all amounts awarded;

l)      Award attorneys' fees and costs; and

m)     Grant such other and further relief as the Court deems just and equitable.

## VIII.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiff demands a trial by jury on all issues so triable.

Dated: April 10, 2020          Respectfully submitted,

                    By:     */s/John D. Radice*
                         John D. Radice
                         RADICE LAW FIRM, P.C.
                         475 Wall Street
                         Princeton, NJ 08540
                         Tel: (646) 245-8502
                         Email: jradice@radicelawfirm.com

                         Eric L. Cramer*
                         Sarah Schalman-Bergen*
                         Patrick F. Madden*
                         Michaela Wallin*
                         BERGER MONTAGUE PC
                         1818 Market Street, Suite 3600
                         Philadelphia, PA 19103
                         Tel: (215) 875-3000
                         Email: ecramer@bm.net
                         Email: sschalman-bergen@bm.net
                         Email: pmadden@bm.net
                         Email: mwallin@bm.net

                         Daniel J. Walker*
                         BERGER MONTAGUE PC
                         2001 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC 20006
                         Tel: (202) 559-9745
                         Email: dwalker@bm.net

Michael K. Yarnoff
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tel: (215) 792-6676
Email: myarnoff@kehoelawfirm.com

*pro hac vice* forthcoming

*Counsel for Plaintiff and the
Proposed Class*